## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

MIKE SETTLE,                          )
                                      )          Case No. 3:19-cv-32
   *Plaintiff*,        )
                                      )          Judge Travis R. McDonough
v.                                    )
                                      )          Magistrate Judge H. Bruce Guyton
MICHAEL PARRIS,                       )
                                      )
   *Defendant*.         )

---

## MEMORANDUM OPINION

---

Plaintiff Mike Settle ("Plaintiff") is a state prisoner proceeding pro se in this 42 U.S.C.

§ 1983 action. Plaintiff sued Defendant Michael Parris ("Defendant")—Warden of Morgan

County Correctional Complex ("MCCX")—in his individual capacity for allegedly violating his

due process and equal protection rights under the Fourteenth Amendment of the United States

Constitution. Before the Court are Defendant's motion for summary judgment (Doc. 40),

Defendant's motion to revoke Plaintiff's *in forma pauperis* status (Doc. 54), and Plaintiff's

motion for subpoenas (Doc. 39). For the reasons below, Defendant's motion for summary

judgment will be **GRANTED** and the parties' remaining motions will be **DENIED AS MOOT**.

## I.  BACKGROUND[1]

Plaintiff is an inmate of the Tennessee Department of Correction ("TDOC"). He is

currently incarcerated at Trousdale Turner Correctional Center ("TTCC") in Hartsville,

Tennessee. (Doc. 50, at 2.) At the time Plaintiff initiated this action, he was incarcerated at

MCCX. (*See* Docs. 1, 2.)

---

[1] This section is based on the undisputed facts in the record.

Plaintiff's allegations arise out of events that occurred during his confinement in the Security Management Unit ("SMU") at MCCX, which he maintains was a "continuation of 19 years [in] segregation."  (Doc. 2, at 3.)[2]  The record is unclear as to when Plaintiff was initially incarcerated at MCCX.  Plaintiff, however, was not placed in the SMU at MCCX "until December of 2017," where he participated in the SMU program.  (Doc. 43, at 3.)

According to the MCCX Inmate Orientation document attached to Plaintiff's amended complaint, the SMU program is a "behavior modification program" designed "to reduce disruptive activity and promote positive behavior by providing the opportunity for change." (Doc. 16, at 16, 18.)  The purpose of the program is "[t]o establish separate restricted population housing units that support the management and rehabilitation of close, medium and minimum restricted inmates with documented disrupted behavior."  (*Id*. at 16.)

---

[2]  The Court notes that the duration of Plaintiff's confinement in the SMU is material in determining whether his continued confinement there implicated a protected liberty interest under the Due Process Clause of the Fourteenth Amendment.  The Court therefore has endeavored to pinpoint the relevant timeframe for analyzing Plaintiff's continued confinement in the SMU based on his complaints, Defendant's personal involvement, and the Court's review of the entire record.  In doing so, the Court notes that Plaintiff does not appear to challenge the reasons for his *initial* placement in the SMU; instead, the crux of his complaints stem from his *continued* confinement there and Defendant's failure to transfer him despite his eligibility for transfer.  Yet, Plaintiff continuously frames the length of his confinement based on his alleged nineteen-plus years in segregation.  (*See* Doc. 2, at 3 (stating that his confinement in the SMU was a "continuation of 19 years [in] segregation"); Doc. 46, at 2 (referring to his "21 years in segregation"); Doc. 47, at 1 (same).)  The record, however, is unclear as to how Defendant was personally involved in his continued confinement during this lengthy period.  Defendant states in his affidavit that he has only been warden at MCCX since March 17, 2018, (Doc. 42, at 1), and the Court cannot rely on any events in which Defendant was not personally involved, *see Harris v. Caruso*, 465 F. App'x 481, 486, 487 n.3 (6th Cir. 2012) (holding that the defendants could not be held "liable for actions that pre-dated their personal involvement" in the inmate's continued confinement in administrative segregation).  The relevant timeframe, therefore, for analyzing Plaintiff's claims is his two-year confinement in the SMU, beginning on September 18, 2018, (Doc. 2, at 3), when he became eligible for transfer, through October 12, 2020, when he was transferred to TTCC, (Doc. 43, at 3; Doc. 50, at 2).

2

The orientation document details the various restrictions placed on the SMU inmates' recreation time, visitation, and phone calls. (*Id*.) Inmates in the SMU must recreate separately from the general prison population. (*Id*.) They are generally permitted to have "no less than one hour of recreation Monday-Friday," subject to the warden's approval. (*Id*.) Recreation time, however, "may be delayed or restricted" if inmates are noncompliant with daily cell inspections. (*Id*.) SMU inmates are "afforded no less than one 30 minute phone call per week," but the Warden may allow additional phone calls as inmates progress through the three unit phases. (*Id*.) Inmates in Phase One, for example, are allowed one call per week; inmates in Phase Two are allowed two calls per week; and inmates in Phase Three are allowed three calls per week. (*Id*.) Visitation privileges also vary depending on an inmate's progress through the unit phases and are subject to the Warden's approval. Inmates in Phase One will have non-contact visits with immediate family members only; inmates in Phase Two will have non-contact visits with individuals who are on an approved visitation list; and inmates in Phase Three will have "contact visits in Program B with those on approved list." (*Id*.)

The SMU Review Board ("the Board") is responsible for assessing and managing an inmate's progress through the SMU program. (*Id*. at 17.) The Board holds a hearing with the inmate "at a minimum of every four months" to assess the inmate's progress. (*Id*.) During the hearing, the Board considers the following factors in assessing the inmate's progress: the inmate's past and recent behavior; the inmate's disciplinary activity; the inmate's participation in programming activities, "such as workbook assignments, motivational interviews and group counseling"; an inmate's involvement in "Security Threat Group Activity"; whether the inmate is a candidate for reclassification and is compliant with the unit programming; and whether the inmate is suitable to partake in alternative programming. (*Id*. at 17–18.)

When an inmate completes the SMU program at MCCX, he is placed on a list for transfer to another prison of the inmate's choice. (Doc. 43, at 3.) The list contains the names of the inmates, the inmate's SMU graduation date, the inmate's custody level, and the inmate's prisons of choice. (Doc. 42-1, at 1–14.) The list is sent weekly to the TDOC Classification Director and the SMU Coordinator. (Doc. 43, at 3.)

On September 18, 2018, Plaintiff completed the SMU program. (Doc. 2, at 3.) Attached to Plaintiff's complaint is a certificate that reflects that Defendant recognized Plaintiff's completion of the SMU program. (Doc. 2-1, at 1.) Plaintiff, however, remained in the SMU, "in the High Security area,"[3] for approximately two years until his transfer to TTCC on October 12, 2020. (Doc. 44, at 4; Doc. 50, at 2.) He was, however, placed on MCCX's inmate transfer list to be moved to the following three prisons of Plaintiff's choice: West Tennessee State Penitentiary (WTSP), Lois M. DeBerry Special Needs Facility (SPND), and Northwest Correctional Complex (NWCX). (Doc. 42-1, at 3, 7, 11; Doc. 43, at 4.)

On October 10, 2018, after completing the SMU program, a three-member panel held a reclassification hearing and reclassified Plaintiff from close to medium custody level. (Doc. 42-2, at 3.) Associate Warden Ken Hutchinson approved the panel's decision. (*Id*.) Plaintiff sought to appeal his reclassification because he wanted his custody level "decrease[d] . . . to minimum[.]" (Doc. 2-1, at 11.) According to Plaintiff, a reclassification form was necessary to

---

[3] The record is unclear as to whether Plaintiff's placement in the "High Security area," in the SMU, (Doc. 50, at 2), was due to Plaintiff's history as an escapee, which Defendant discusses in his undisputed facts, (Doc. 43, at 1–3 (citing *Willis v. Settle*, 162 S.W.3d 169, 172 (Tenn. Ct. App. 2004)).) After Plaintiff's escape, Defendant states that he "remained housed in administrative segregation in TDOC facilities *until* December 2017 when he was placed in the" SMU at MCCX. (*Id*. at 3 (emphasis added).) Plaintiff does not say when he was placed in the SMU, but, unlike Defendant, he makes no distinction between the SMU and administrative segregation, referring to them interchangeably throughout the record.

appeal his reclassification. (Doc. 16, at 2.) Plaintiff alleges, however, that Defendant failed to provide him with the form despite "inform[ing] him that he was denied a copy . . . upon request[.]" (*Id.* at 2.)

In November 2018 and January 2019, the Board reviewed Plaintiff's placement in the SMU. (Doc. 42-3, at 1–2.) The Board documented its review of Plaintiff's SMU status on summary forms. (*Id.*) The forms indicate that Plaintiff "graduated from SMU," was "waiting to be moved," and that there were no "recent issues [with Plaintiff]." (*Id.*) The Board recommended "continue[d] monthly reviews per policy." (*Id.*) Defendant signed the Board's summary forms. (*Id.*)

There are no additional monthly reviews from the Board in the record, but it does contain monthly mental-health screening reports that Plaintiff received from various MCCX mental-health providers, beginning in January 2018 through August 2020, and assessments from a unit counselor at MCCX, beginning in December 2019 through August 2020. (Doc. 42-4, at 1–34; Doc. 42-3, at 3–11.) The monthly mental-health screening reports reflect that Plaintiff was receiving treatment for "mental health problems."[4] (Doc 42-4, at 1–34.) He was "prescribed psychotropic medication" beginning in February 2018 through January 2020. (*Id.* at 2–26.) Two of the mental-health screening reports indicate that Plaintiff had a history of suicidal behavior, (*id.* at 31, 34), but all reflect that Plaintiff consistently denied having *present* suicidal ideations and "current mental health complaint[s]" during his confinement in the SMU, (*id.* at 1–34).

---

[4]  There are two mental-health screening reports, one dated June 18, 2020, and the other dated July 17, 2020, that are incomplete. (Doc. 42-4, at 32–33.) But they reflect that Plaintiff "refused to answer" the therapist's questions, denied "all [of the therapist's] attempts" to assess his mental-health status, and "refused to participate in [the] segregation check" during those two months. (*Id.*)

The unit counselor also assessed Plaintiff's continued placement in the SMU on "Continued Segregation Monthly Placement" forms. (Doc. 42-3, at 3–11.) The forms reflect that Plaintiff was an SMU "graduate awaiting placement by Central Transportation to a new facility." (*Id.*) The assessments from March 2020 through August 2020 contain the additional notation that there was "currently no movement due to COVID 19." (*Id.* at 6–11.)

On January 22, 2019, Plaintiff commenced this action against Defendant.[5] (Doc. 2 at 1, 10). Plaintiff alleges that Defendant violated his due-process and equal-protection rights in the following ways: (1) Defendant's "inactions to release [P]laintiff from (SMU) segregation, to be transferred to another prison" violated his fourteenth amendment due-process rights, (Doc. 2, at 7); (2) Defendant's failure to provide Plaintiff with the reclassification form to allow him to appeal his reclassification "denied [him] due process," (Doc. 16, at 2); Defendant's "failure to transfer [P]laintiff to another prison like white inmates" and inmates "similarly situated" violated his equal-protection rights under the Fourteenth Amendment, (*id.* at 4); and Defendant's "denial of [the] . . . reclassification form[,] as provided to inmates similarly situated[,] denied [P]laintiff the equal protection of [the] law," (*id.* at 2).[6] He seeks a declaratory judgment and an injunction, as well as $8,000 in compensatory damages and $5,000 in punitive damages. (*Id.* at 8–9.)

---

[5] Plaintiff also sued Anthony Gibson ("Gibson"), MCCX's SMU Counselor, in his official and individual capacity and Defendant in his official capacity. (*See* Doc. 2.) On August 15, 2019, the Court screened Plaintiff's complaint pursuant to the Prison Litigation Reform Act ("PLRA"). (Doc. 8.) The Court dismissed all of Plaintiff's claims against Gibson for failure to state a claim upon which relief could be granted under § 1915(e)(2)(B)(ii). (Doc. 8, at 24.) It also dismissed Plaintiff's official-capacity due-process claims against Defendant without prejudice. (*Id.* at 22.)

[6] On December 4, 2019, Plaintiff moved to amend his complaint to add equal protection and additional due process claims that he stated "ha[d] . . . accrued since the beginning of the suit." (Doc. 16, at 1.) The Court noted that Plaintiff appeared to have mostly realleged his due process claims that he originally pleaded in his complaint. (Doc. 31 at 4.) In liberally construing Plaintiff's claims, however, the Court allowed his equal-protection and additional due-process claims—some of which appeared to include additional factual allegations relating to the conditions of his confinement in the SMU—to proceed. (*Id.* at 16.)

Defendant moved for summary judgment. (Doc. 40). Plaintiff responded in opposition (Doc. 44),[7] and Defendant replied (49). Defendant's motion is fully briefed and ripe for adjudication.

## II.  STANDARD OF REVIEW

Summary judgment will be proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Federal Rule of Civil Procedure 56(a), (c). The moving party bears the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. A fact is material if proof of that fact establishes or refutes an essential element of a party's cause of action or defense. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The movant can discharge its initial burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, at which point, the nonmoving party, to survive summary judgment, must identify facts in the record that create genuine issues of material fact. *Celotex*, 477 U.S. at 324–25.

---

[7] Defendant points out in his reply that Plaintiff appears to raise a new retaliation claim for the first time in his opposition and asserts that the Court should not consider it. (Doc. 49, at 1.) Plaintiff mentions in his opposition that Defendant delayed his "transfer in retaliation against" him. (Doc. 46, at 4, 10.) He cites to *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999), in which an inmate raised a first amendment claim based on the prison officers' retaliation against him. The Court agrees that Plaintiff appears to raise a new legal theory for the first time in his opposition that he failed to address in his pleadings, and the Court cannot consider it. *Tucker v. Union of Needletrades*, 407 F.3d 784, 788 (6th Cir. 2005) (holding that the non-moving party could not raise a new legal claim for the first time in his response to the defendants' motion because the defendants would be "unfair[ly] surprise[d]").

To bar summary judgment, "the non-moving party . . . must present sufficient *evidence* from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (emphasis added). "Conclusory allegations, speculation, and unsubstantiated assertions are not evidence and are not enough to defeat a well-supported motion for summary judgment." *Gooden v. City of Memphis Police Dept.*, 67 F. App'x 893, 895 (6th Cir. 2003). Merely resting on the pleadings is also insufficient to defeat summary judgment; the nonmoving party "must present significant *probative* evidence in support of its complaint." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (emphasis added).

When considering a motion for summary judgment, the court must take the non-moving party's evidence as true and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). The court does not make credibility determinations or "weigh the evidence." *Id.* at 249. It determines only whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Not every factual dispute, however, will preclude summary judgment; the disputed facts must be genuine and material under the substantive law governing the issue at hand. *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

## III.   ANALYSIS[8]

### A.  Claims for Injunctive and Declaratory Relief

The Court will begin its analysis by first addressing the Plaintiff's claims for an injunction and a declaratory judgment, which Defendant argues are moot in light of Plaintiff's

---

[8] The Court refers to the Plaintiff's allegations in his amended complaint (Doc. 16) throughout this section for purposes of framing the issues that are before the Court.

transfer to TTCC. (Doc. 49, at 3 (citing *Kensu v. Haigh*, 87 F.3d 172 (6th Cir. 1996); *Henderson v. Martin*, 73 F. App'x 115 (6th Cir. 2003)).) In his amended complaint, Plaintiff seeks a declaratory judgment due to Defendant's failure to transfer him out of the SMU at MCCX. (Doc. 16, at 7.) He also seeks an injunction from the Court ordering his "immediate[ ] transfer . . . to another prison to be placed in [the] general [prison] population." (*Id.*)

Defendant raises his mootness argument for the first time in his reply, and, ordinarily, courts do not consider an argument that a party raises for the first time in a reply brief. *See Ryan v. Hazel Park*, 279 F. App'x 335, 339 (6th Cir. 2008) ("Generally, this Court has found that an issue raised for the first time in a reply to a response brief in the district court is waived."). But even so, "[m]ootness is a jurisdictional issue," so the Court has license to raise it sua sponte. *Rideout v. Eichenlaub*, No. 08-CV-10633, 2008 WL 4960172, at *2 (E.D. Mich. Nov. 20, 2008) (citing *N.C. v. Rice*, 404 U.S. 244, 246 (1971)); *see Medberry v. Crosby*, 351 F.3d 1049, 1054 n.3 (2003) (holding that, because mootness "strik[es] at the heart of federal subject matter jurisdiction" it may be raised sua sponte); *see also Sykes v. Swanson*, No. 2:20-CV-12421, 2020 WL 6273462, at *1–2 (E.D. Mich. Oct. 26, 2020) (raising the mootness doctrine sua sponte when a prisoner was transferred to a different detention facility).

"Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (citation omitted). The Sixth Circuit has held that, generally, a § 1983 claim against a prison official becomes moot once the prisoner transfers from the facility that formed the basis of the prisoner's complaints. *See Henderson*, 73 F. App'x at 115; *Graham v. Mercer*, 198 F.3d 245, 245 (6th Cir. 1999) ("A prisoner's request for injunctive and declaratory relief is moot upon his transfer to a different facility."); *Kensu v. Haigh*, 87 F.3d at 172.

9

In *Henderson*, the Sixth Circuit considered whether the district court erred in holding that the plaintiff's claim for injunctive relief in his § 1983 action was moot. 73 F. App'x at 117. At the time the plaintiff filed suit, he was incarcerated at Lakeland Correctional Facility ("LCF"), where he alleged that he suffered from health problems due to his exposure to high levels of environmental tobacco smoke. *Id*. at 116. He sued various LCF prison officials for damages and injunctive relief. *Id*. As part of his claim for injunctive relief, he requested to be transferred from LCF to smoke-free housing. *Id*. at 117. The defendants moved for summary judgment, but by the time the district court decided their motion, the plaintiff had already been transferred to another facility. *Id*. The district court held that the plaintiff's claim for injunctive relief against the LCF officials was moot based on his transfer. *Id*. The plaintiff appealed, arguing that his request for injunctive relief was not moot because he still suffered from smoke exposure at the new facility where he was transferred. *Id*. The Sixth Circuit disagreed, holding that the plaintiff's claim for injunctive relief against the LCF officials was indeed moot. *Id*. at 117, 119.

The Sixth Circuit in *Kensu* also held that the plaintiff's requests for declaratory and injunctive relief were moot upon his transfer to a different prison. 87 F.3d at 175. There, the plaintiff sued various officials from the Michigan Department of Corrections in their individual and official capacities. *Id*. The plaintiff claimed that the defendants violated his constitutional rights by "improperly examining his legal mail outside of his presence." *Id*. at 173–74. The Court held that the plaintiff's requests for declaratory and injunctive relief were moot because he was no longer incarcerated at the institution where the defendants searched his mail. *Id.* at 175.

Plaintiff's claims for injunctive and declaratory relief are similarly moot for two reasons. First, Plaintiff's claims for an injunction and a declaratory judgment are limited to Defendant's actions and inactions as Warden at MCCX. (*See* Docs. 2, 16.) Because Plaintiff has transferred

from MCCX to TTCC since commencing this action, he no longer faces the potential for future harm from Defendant. Second, Plaintiff's claim for an injunction is solely premised on his desire to be "immediately transfer[red]" from the SMU at MCCX to another prison. (Doc. 16, at 7.) Since commencing this action, Plaintiff has been transferred to TTCC and is no longer incarcerated at MCCX. Accordingly, Plaintiff's claims for declaratory and injunctive relief are **MOOT**, and the only claims which remain are those for monetary damages.

### B. Claims for Monetary Damages

#### 1. Plaintiff's Claims Regarding the Reclassification Form

Defendant argues that he is entitled to summary judgment with respect to Plaintiff's equal-protection and due-process claims relating to the reclassification form because Defendant maintains that he was not personally involved in active unconstitutional conduct. (Doc. 41, at 12.) Plaintiff claims that Defendant violated his equal-protection and due-process rights under the Fourteenth Amendment by "fail[ing] to send [him] a copy of the requested . . . [re]classification document." (Doc. 16, at 2, 6.) According to Plaintiff, the form was necessary to appeal his reclassification following his October 10, 2018 reclassification hearing after a three-member panel reclassified Plaintiff from "close to medium" security custody level. (*Id.* at 2; Doc. 42-2, at 3.) Plaintiff alleges that Defendant violated his equal-protection rights when Defendant "deni[ed] [him] . . . the appeal reclassification [form]" because he claims Defendant provided the form to "inmates similarly situated." (Doc. 16, at 2, 6.) He also alleges that Defendant's "actions or inactions to send [him] a copy of the classification document violated [his] due process [rights.]"[9] (*Id.* at 6.)

---

[9] A liberal construction of Plaintiff's amended complaint indicates that he appears to claim that he has a liberty interest in appealing his reclassification under state law, Tennessee Code Annotated § 41-21-202. (*See* Doc. 16, at 2, 6.) Plaintiff appears to allege that Defendant

Proof of personal involvement is required for an official to be held liable under § 1983. *Miller v. Calhoun Cty.*, 408 F.3d 803, 823 n.3 (6th Cir. 2005). To establish liability under § 1983, a plaintiff must "show that the official, under color of state law," deprived him of a federal right. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). The alleged violation of a federal right must be based on the official's "*active* unconstitutional behavior." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (emphasis added). The law is therefore well-settled that a government official cannot be liable for a subordinate's unconstitutional conduct under a theory of *respondeat superior* or vicarious liability. *See Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016); *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) ("'[Section] 1983 liability cannot be imposed under a theory of *respondeat superior*[.]'" (quoting *Miller*, 408 F.3d at 817 n.3)). Consequently, an official's mere failure "to intervene on a prisoner's behalf to remedy alleged unconstitutional behavior does not amount to active unconstitutional behavior" on the official's part. *Grumbly v. Michigan*, No. 2:11-cv-185, 2011 WL 3418245, at *4 (W.D. Mich. Aug. 4, 2011) (citing *Shehee*, 199 F.3d at 300). The plaintiff, at the very least, must establish "that a supervisory official . . . implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

Defendant argues that he had no initial personal involvement in Plaintiff's October 10, 2018 reclassification proceedings and maintains that Plaintiff's allegation that he merely failed to provide him with a form "does not transfer [him] into a participant in the proceedings." (Doc. 41, at 13–14.) In his affidavit, he attests that Associate Warden Ken Hutchinson ("Hutchinson")

---

interfered with that state-created liberty interest by failing to provide him with the form because, according to Plaintiff, the form was necessary to appeal his reclassification. (*Id.*)

approved Plaintiff's reclassification at the October 10, 2018 reclassification hearing and, therefore, Defendant states that he had no personal involvement in Plaintiff's reclassification. (Doc. 42, at 2–3.) In the alternative, Defendant argues that, even if Plaintiff could prove his personal involvement, "Plaintiff d[oes] not have due process rights in . . . reclassification proceedings." (Doc. 41, at 14 (citing *Garrison v. Corr.*, 26 F. App'x 410, 412 (6th Cir. 2001)).)

Defendant does not dispute that Plaintiff sought to appeal his reclassification. (Doc. 42, at 2 (stating that "[a]s the reclass document attached hereto . . . shows, [Plaintiff] appealed the reclassification").) Attached to Defendant's motion is the reclassification form from Plaintiff's October 2018 reclassification hearing. (Doc. 42-2, at 3.) The form reflects that three individuals, none of whom were Defendant, decided Plaintiff's reclassification on October 10, 2018. (*Id.*) Hutchinson approved the panel's reclassification decision, and Plaintiff signed the form, indicating on the form that he wished to appeal the decision. (*Id.*) According to the form, if the inmate marked "yes" to an appeal, "appeal and copy" were to be provided to the inmate. (*Id.*)

Plaintiff responds that Defendant was personally involved in his reclassification proceedings in two ways. In his declaration, he states that Defendant was personally involved in his reclassification proceedings because Plaintiff "informed [Defendant] that [he] was denied a copy of the . . . [re]classification document." (Doc. 48, at 4.) He also points to TDOC policy number 401.08[10] as proof of Defendant's personal involvement because, according to Plaintiff, this policy "require[s] the warden [Defendant]," not Hutchinson, to approve his reclassification. (*Id.* at 3.) He ignores Defendant's evidence showing that Hutchinson approved his

---

[10] This policy is attached as a part of Plaintiff's amended complaint, but it was not effective during the timeframe at issue. (Doc 16, at 12–13 ("EXPIRATION DATE: September 1, 2013").)

reclassification, and Plaintiff's evidence does not speak to whether Defendant was personally responsible for providing him with the form.

Plaintiff has not provided "significant probative evidence" showing that Defendant was personally involved in *active* unconstitutional behavior. *Copeland*, 57 F.3d at 479. He states in his declaration that he merely "*informed* [Defendant] that [he] was denied a copy of the . . . [re]classification document." (Doc. 48, at 4 (emphasis added).) But this conclusory statement shows that Defendant, at most, "fail[ed] to intervene on [Plaintiff]'s behalf" and "fail[ed] to remedy" someone else's alleged behavior. *Shehee*, 199 F.3d at 300. Mere failure to act, however, even "when the situation [i]s in . . . [a defendant's] control," does not "constitute[ ] an acquiescence in the unconstitutional misconduct." *Id*. Plaintiff, moreover, has not presented any evidence that Defendant, as a supervisor, "either encouraged the specific incident or misconduct or in some other way directly participated in it." *Hays v. Jefferson Cnty., Ky.*, 668 F.2d 869, 874 (6th Cir. 1982).

For these reasons, no reasonable jury could conclude that Defendant was personally involved in Plaintiff's October 10, 2018 reclassification proceedings or that he was otherwise actively involved in unconstitutional behavior by failing to provide him with the reclassification form. Defendant is therefore entitled to summary judgment as a matter of law as to Plaintiff's equal-protection and due-process claims relating to his October 2018 reclassification proceedings. Accordingly, these claims will be **DISMISSED**.

### 2. Plaintiff's Due-Process Claims

The Fourteenth Amendment's Due Process Clause guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has both substantive and procedural components. *See Prater*

*v. City of Burnside, Ky.*, 289 F.3d 417, 431 (6th Cir. 2002) ("This Clause clothes individuals with the right to both substantive and procedural due process." (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987))). Substantive due process protects individuals from government conduct that "shocks the conscience," *Rochin v. Cal.*, 72 S. Ct. 205, 209 (1952), and that interferes with an individual's "'fundamental rights and liberties which are . . . deeply rooted in this Nation's history and tradition[ ] and [that are] implicit in the concept of ordered liberty,'" *Guertin v. State*, 912 F.3d 907, 918 (6th Cir. 2019) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). Procedural due process, on the other hand, ensures "that an individual who is deprived of an interest in liberty or property be given notice and a hearing." *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001).

In the context of § 1983 actions, the Supreme Court has recognized "three kinds" of due process claims that a prisoner may bring against a state official under the Fourteenth Amendment. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The first kind is one in which a prisoner claims that a state official violated his or her protections defined in the Bill of Rights, *e.g.*, freedom of speech under the First Amendment or freedom from unlawful searches and seizures under the Fourth Amendment. *Id.* The second kind of claim entails the substantive component, which "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). The third type of § 1983 claim that a prisoner may bring is for a violation of procedural-due-process rights, which, as noted above, guarantees fair procedure. *Id.*

For the first two claims, "the constitutional violation under § 1983 is complete when the wrongful action is taken." *Id.* (citation omitted). For the third type of claim, however, depriving a prisoner of a protected life, liberty, or property interest is not a constitutional violation in and

of itself. *Id.* at 126. That is, the constitutional violation occurs when a state official deprives a prisoner of life, liberty, or property *without* due process of law. *Id.*

In his amended complaint, Plaintiff does not claim that Defendant violated any of the specific guarantees in the Bill of Rights. (*See* Doc. 16.) He instead invokes the Due Process Clause generally, using the catchall phrase: "Defendant Parris . . . violated *substantive* due process of the Fourteenth Amendment[.]" (*Id.* at 6 (emphasis added).) Yet, his claims sound in procedural due process and fit squarely within the purview of *Sandin v. Conner*, 515 U.S. 472, 476, 486 (1995) —a case in which the Supreme Court determined whether a prisoner's confinement was "the type of atypical, significant deprivation" that would implicate fourteenth amendment *procedural* due process protections. *See Cannon v. Bernstein*, No. 09-14058, 2015 WL 13741225, at *12 (E.D. Mich. May 16, 2015) ("Virtually all case law addressing when confinement in administrative segregation reaches the level of a federally cognizable liberty interest under the Due Process Clause, do so in the context of *procedural* due process, not substantive due process." (emphasis in original)).

As to Defendant's "so-called substantive due process claims," the Supreme Court "has cautioned courts to carefully scrutinize [them] . . . 'because guideposts for responsible decision making in this unchartered area are scarce and open-ended.'" *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 452 (6th Cir. 2002) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). In carefully scrutinizing such claims, the Sixth Circuit has followed the Supreme Court's instruction "'to focus on the allegations in the complaint to determine how [the plaintiff] describes the constitutional right at stake and what the [government actor] allegedly did to deprive [the plaintiff] of that right.'" *Id.* (citation omitted). And, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular

sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 266 (internal quotation marks and quotation omitted).

Citing to *Albright*, Defendant's position is that Plaintiff's substantive-due-process claims are inapplicable and that the Eighth Amendment is the proper constitutional source for analyzing Plaintiff's claims. (Doc. 41, at 4.) Turning to Plaintiff's amended complaint, the Court agrees. Plaintiff does not clearly identify his theory of liability in his amended complaint, but he refers to the "nature of conditions" in the SMU. (Doc. 16, at 5.) He claims, for instance, that he wore handcuffs and leg irons while out of the cell, (*id*. at 4), and that Defendant "denied [him] . . . contact visit[s], more phone calls, [and] more yard time," (*id*. at 5). As a result of his continued confinement in the SMU, he further claims that he was "suicid[al]" and was "denied adequate mental health treatment" there. (*Id*. at 2.)[11]

The Sixth Circuit has analyzed similar claims under the Eighth Amendment. *See Grabow v. Cty. of Macomb*, 580 F. App'x 300, 307 (6th Cir. 2014) (determining whether the defendants were deliberately indifferent to the inmate's suicidal tendencies ); *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (determining whether the defendants used excessive force by restraining the inmate in handcuffs in his cell); *see also Snider v. Saad*, No. 1:20-cv-963, 2020 WL 6737432, at *5–*6 (W.D. Mich. Nov. 17, 2020) (analyzing whether the inmate's conditions of confinement in segregation amounted to cruel and unusual punishment under the Eighth Amendment). The proper redress for Plaintiff's claims, therefore, would be under the Eighth Amendment rather than "the more generalized notion of substantive due process." *Albright*, 510

---

[11] Plaintiff does not state *who* failed to provide him adequate medical treatment while confined in the SMU.

U.S. at 266 (internal quotation marks and quotation omitted); *see Walker v. Norris*, 917 F.2d 1449, 1455 (6th Cir. 1990) ("Under the circumstances, the plaintiff's section 1983 claim in a case such as this must be for redress of eighth amendment, not fourteenth amendment substantive due process, rights."); *see also Smith v. Mich.*, 265 F. Supp. 2d 704, 707–08 (E.D. Mich. 2003) (holding that the inmate's substantive due process claims should be analyzed under the Eighth Amendment).

### a. Eighth Amendment Claims

The Eighth Amendment prohibits government officials from "exhibit[ing] 'deliberate indifference'" to a prisoner's serious medical needs and from using excessive force against a prisoner. *Hudson v. McMillian*, 503 U.S. 2, 9 (1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). But it also protects prisoners from prison conditions that amount to cruel and unusual punishment. *See Rhodes v. Chapman*, 452 U.S. 337, 352 (1981). "Not every unpleasant experience a prisoner might endure while incarcerated," however, amounts to cruel and unusual punishment under the Eighth Amendment. *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987). Nor do harsh or uncomfortable prison conditions automatically create an Eighth Amendment violation. *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012). The conditions, rather, must result in "[u]nquestioned and serious deprivation[s] of basic human needs." *Rhodes*, 452 U.S. at 345–347.

In conditions-of-confinement cases, the Sixth Circuit has held that "the Eighth Amendment is concerned *only* with 'deprivations of essential food, medical care or sanitation' or 'other conditions intolerable for prison.'" *Flanory v. Bonn*, 604 F.3d 249, 253 (6th Cir. 2010) (emphasis added) (quoting *Rhodes*, 452 U.S. at 347). To establish an eighth amendment conditions-of-confinement claim, a plaintiff must establish both an objective *and* a subjective

component. *Richmond v. Settles*, 450 F. App'x 448, 455 (6th Cir. 2011). Under the objective component, the plaintiff must show that he was "subjected to specific deprivations that are so serious that they deny him 'the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes*, 452 U.S. at 347); *see Barker*, 649 F.3d at 434 ("We have held that there is a substantial risk of serious harm in the denial of the minimal civilized measure of life's necessities[.]" (internal quotation marks and quotation omitted)). Under the subjective component, the plaintiff must "demonstrate that the prison officials acted wantonly, with deliberate indifference to the plaintiff's serious needs." *Id.* (citation omitted). The burden is on a plaintiff, therefore, to show that the deprivation is "objectively, 'sufficiently serious'" and that the prison official had a "'sufficiently culpable state of mind'"—that is, that an official was deliberately indifferent to an inmate's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297–98 (1991)).

Defendant argues that Plaintiff "does not allege that he has been denied essential life necessities in the SMU," and, although his confinement there may been uncomfortable and even harsh, his complaints do not establish an Eighth Amendment claim. (Doc. 41, at 5–6.) He does not dispute that Plaintiff was not immediately transferred out of the SMU once he completed the SMU program. But he states in his affidavit that he had "no control over [Plaintiff's] transfer" and that any delay in Plaintiff's transfer out of the SMU was because another prison had not yet accepted Plaintiff for transfer. (Doc. 42, at 1–2.)

In his affidavit, he also details the procedures for transferring an inmate when an inmate completes the SMU program at MCCX. (*Id*. at 1–2.) According to Defendant, once an inmate, like Plaintiff, completes the SMU program, the inmate is placed on a list for transfer to another prison, which contains the inmate's three choices of prisons. (*Id*. at 1.) The inmate transfer lists,

attached as exhibits to Defendant's motion, reflect that Plaintiff was an SMU graduate and was waiting to be transferred to the following three prisons of his choice: West Tennessee State Penitentiary ("WTSP"), Lois M. DeBerry Special Needs Facility ("SPND"), and Northwest Correctional Complex ("NWCX"). (Doc. 42-1, at 1, 3, 6–7, 11, 13.)

Defendant also attests that Plaintiff received monthly mental health screenings in the SMU. (Doc. 42, at 3; *see* Doc. 42-4, at 1–34.) He states that the mental health screenings reflect that Plaintiff denied having suicidal or homicidal ideations. (Doc. 42, at 3.) Also attached as exhibits to Defendant's motion are Plaintiff's mental-health screenings, which show that he was receiving "mental health treatment" and consistently denied having suicidal or homicidal ideations. (Doc. 42-4, at 1–34.)

Because Defendant has discharged his initial burden by showing "an absence of evidence to support" Plaintiff's Eighth Amendment conditions-of-confinement claims, the Plaintiff, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 324–25. The "mere existence of a scintilla of evidence" supporting Plaintiff's position will not be sufficient to defeat Defendant's motion. *Anderson*, 477 U.S. at 252.

In his declarations, Plaintiff mostly reiterates the same complaints he raises in his pleadings, stating that Defendant "den[ied] [him] . . . contact visit[s], more phone time, and more recreation time," despite completing all unit Phases in the SMU program. (Doc. 47, at 1–2.) He further states in his declaration that he was locked in a cell for twenty-three hours a day and wore leg irons and handcuffs while out of his cell. (Doc. 48, at 3.) He disputes Defendant's claim that he had no control over his transfer and states that Defendant "intentionally ke[pt] [him] locked in administrative segregation." (*Id*. at 1.) He also disputes Defendant's claim that Plaintiff did not

suffer from suicidal ideations, stating that, on May 19, 2020, he "was placed on suicide watch for three (3) days." (*Id*. at 4.)

Plaintiff, however, has not "presented significant probative evidence" in support of his eighth amendment claim to preclude summary judgment. *Copeland*, 57 F.3d at 479. First, Plaintiff's claims that he was denied "*more* recreation time," "*contact* visit[s]," and "more phone time," (Doc. 47, at 2 (emphasis added)), are not deprivations that "fall below 'the minimal civilized measure of life's necessities,'" *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004) (quoting *Rhodes*, 452 U.S. at 347). He merely states in his declaration that he lost privileges during his continued confinement in the SMU, and the mere loss of privileges is insufficient to support an Eighth Amendment claim. *See Bishawi v. Ne. Ohio Corr. Ctr.*, 628 F. App'x 339, 345–46 (6th Cir. 2014) (holding that "frequent lockdowns, . . . restricted access to certain amenities, . . . and loss of certain privileges while in segregation" do not support an eighth amendment claim); *Argue v. Hofmeyer*, 80 F. App'x 427, 429–30 (6th Cir. 2003) (recognizing that "[t]his court has never set a minimum amount of time a prisoner must have access to outdoor recreation").

Nor do Plaintiff's cursory assertions that he was in a cell for twenty-three hours a day and wore leg irons and handcuffs for a limited time, *i.e.*, while *out* of his cell, rise to the level of cruel and unusual punishment absent evidence that *Defendant* applied force to "maliciously and sadistically" harm Plaintiff.[12] *Barker*, 649 F.3d at 435; *see Argue*, 80 F. App'x at 429 (holding that an inmate's confinement to his cell for twenty-three hours a day did not violate his eighth amendment rights). The evidence here, for instance, is distinguishable from *Barker*, in which the Sixth Circuit held that the circumstantial evidence was sufficient such that a reasonable jury

---

[12] Plaintiff does not state who restrained him.

could conclude that the defendants applied force "maliciously and sadistically" to harm the plaintiff. *Id*. at 434–35. In *Barker*, the prisoner's hands were handcuffed behind his back for twelve hours in his cell. *Id*. at 434. His restraints caused him to miss a meal, prevented him from using the restroom and obtaining water, and from moving around without pain. *Id*. The Court held that it could infer from the evidence that the defendants knew that the restraints would harm the plaintiff and that they chose to ignore the conditions of the plaintiff's confinement. *Id*. at 435.

The record before the Court here, in contrast, does not allow it draw a similar inference; Plaintiff has not presented any evidence that would allow a factfinder to conclude that Defendant, by allegedly using handcuffs and leg irons to restrain Plaintiff while out of his cell, "applied [force] maliciously and sadistically" to harm him. *Id*. at 434.

Plaintiff's claim that he was denied adequate medical treatment in the SMU also fails under the subjective prong of the deliberate-indifference analysis. The Sixth Circuit has held that "psychological needs may constitute serious medical needs" under the objective component of a deliberate-indifference claim, "especially when they result in suicidal tendencies." *Comstock v. McCrary*, 273 F.3d 693, 703–04 (6th Cir. 2001) (citing *Horn v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). But even if Plaintiff could prove he suffered from a "'sufficiently serious' medical need" under the objective prong, he has not presented evidence that could allow a reasonable factfinder to conclude that Defendant had a sufficiently culpable state of mind under the subjective prong—specifically, that: (1) Defendant knew of Plaintiff's serious medical need, *and* (2) Defendant disregarded or responded unreasonably to that need. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 483 (6th Cir. 2020).

For instance, although Plaintiff states in his declaration that Defendant intentionally kept him in the SMU and that he was suicidal in May of 2020, neither of Plaintiff's declarations speak to whether Defendant *knew* he was suicidal. (Docs. 47, 48.) Nor could a jury infer that Defendant could have known that Plaintiff was suicidal based on the evidence, as none of the mental health screenings, including those two from May of 2020, reflect that Plaintiff suffered from present suicidal ideations. (Doc. 42-4, at 1–34.) Plaintiff's evidence is also silent as to how Defendant "'disregarded or responded unreasonably'" to a serious medical need, as he does not dispute that he received monthly mental-health screenings during his continued confinement in the SMU. *Troutman*, 979 F.3d at 483 (quoting *Downard for Estate of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020)).

No reasonable jury, therefore, could conclude that Plaintiff was denied the minimal civilized measure of life's necessities during his continued confinement in the SMU or that Defendant was deliberately indifferent to Plaintiff's health or safety. Defendant is, therefore, entitled to summary judgment as a matter of law, and these claims will be **DISMISSED** accordingly.

### b. Procedural-Due-Process Claims

Defendant argues that he is entitled to summary judgment as a matter law with respect to Plaintiff's procedural-due-process claims. (Doc. 41, at 6.) He maintains that, even if Plaintiff's continued confinement in the SMU implicated a liberty interest, he received all the due process to which he was entitled. (*Id*. at 6–10.)

Plaintiff alleges that Defendant's failure to transfer him out of the SMU "to another prison," following his completion of the SMU program, violated his liberty interest under the Fourteenth Amendment. (Doc. 16, at 3; *see* Doc. 2, at 1.) A liberal construction of his amended

complaint indicates that he appears to point to the conditions of his confinement, in their totality, as reasons why his continued confinement in the SMU implicated his liberty interest under the Fourteenth Amendment. Again, he alleges that he was "locked-down in a cell for 23 hours a day, [had] 1 hour [of] yard time," wore leg irons and handcuffs while out of his cell, and was denied "the right to contact visit[s], more phone calls, [and] more yard time" in the SMU. (*Id.* at 4–5.) According to Plaintiff, "the nature of the [SMU] conditions" amounted to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." (*Id.* at 5.)

To establish a procedural due process violation, a plaintiff must show that: (1) he was deprived of a liberty interest; and (2) the deprivation occurred without the requisite due process owed to him. *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).

### i. Liberty Interest

"A liberty interest may arise from the Constitution itself" or "from an expectation or interest created by state law or policies." *Id*. at 221. Prisoners' liberty interests, however, are narrower than other citizens' due to the very fact of their confinement. *Wolff v. McDonnell*, 418 U.S. 539, 594 (1974); *see Grinter v. Knight*, 532 F.3d 567, 573 (6th Cir. 2008). But that does not mean that "prisoners . . . shed all constitutional rights at the prison gate." *Sandin*, 515 U.S. at 485 (citing *Wolff*, 418 U.S. at 555); *see Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008) ("Even after a proper conviction and sentence, an inmate still retains a 'liberty' interest, guarded by due process, with respect to state-imposed prison discipline that rises to the level of an 'atypical and significant hardship on the inmate.'" (quoting *Sandin*, 515 U.S. at 484).

A prisoner, however, has no "inherent constitutional right to avoid prison transfers or segregated housing." *Hill v. Lappin*, 630 F.3d 468, 469 (6th Cir. 2010). Mere placement in administrative segregation itself, therefore, does not implicate protectible liberty interests under

the Due Process Clause. *See Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010) ("Simply disagreeing with being placed in administrative segregation does not make it atypical and significant." (internal quotation marks and quotation omitted)). The Supreme Court in *Sandin* has held that an inmate must show, rather, that his continued confinement rose to the level of "atypical and significant hardship in relation to the ordinary incidents of prison life." 515 U.S. at 484.

*Sandin*, therefore, sets forth the standard for determining whether a plaintiff is deprived of a liberty interest in the correctional context. *Id*. at 483; *see Wilkinson*, 545 U.S. at 224 (applying *Sandin* to "the correctional context"). In *Sandin*, the Court abandoned its past approach that it adopted in *Hewitt v. Helms*, 459 U.S. 460 (1983), which focused on the mandatory language of a particular prison regulation in determining whether an inmate had a liberty interest. 515 U.S. at 483, 505 n.5. This approach, the Court stated, "strayed from the real concerns undergirding the liberty protected by the Due Process Clause." *Id*. at 484. The Court expressed that it should return to those due-process principles that it correctly established and applied in *Wolff*, 418 U.S. at 539, and *Meachum v. Fano*, 427 U.S. 215 (1976) —two cases in which the Supreme Court focused on the *nature* of the deprivation when analyzing whether an inmate had a protectible liberty interest. *Id*. at 472–73. Returning to those principles, the Court in *Sandin* held that whether a liberty interest is implicated should turn on whether the alleged liberty deprivation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484.

*Sandin* illustrates that this standard requires a fact-intensive inquiry into the conditions of a prisoner's confinement. The issue before the Court was whether the prisoner had a liberty interest in remaining free from disciplinary segregation in the prison's Special Holding Unit

("SHU") and, if so, whether he was entitled to the procedural protections under the Due Process Clause. *Id.* at 476. The prisoner in *Sandin* was serving an indeterminate sentence of thirty years to life in a Hawai'i maximum-security prison. *Id.* at 474–75. While there, the plaintiff received disciplinary infractions for using abusive and obscene language against a prison officer and for "using physical interference to impair a correctional function." *Id.* at 475.

The adjustment committee held a disciplinary hearing stemming from his infraction, and the committee refused to consider the prisoner's request to present witnesses at the hearing. *Id.* The committee found the prisoner guilty of the charged infractions and sentenced him to thirty days in disciplinary segregation in the SHU. *Id.* at 475–76. The plaintiff sued the adjustment-committee chair and prison officials claiming that they violated his procedural due process rights under the Fourteenth Amendment. *Id.* at 476.

In analyzing the plaintiff's claim, the Court first determined whether he had a liberty interest in remaining free from disciplinary segregation. In making this determination, the Court considered the duration of the prisoner's confinement in disciplinary segregation; whether the length of his confinement there exceeded the duration of his indeterminate thirty-year-to-life prison sentence; and compared the conditions imposed on prisoners in the general population, administrative custody, and protective custody to those conditions imposed on the plaintiff in disciplinary segregation. *Id.* at 475, 486–87. As to the duration of the plaintiff's confinement in disciplinary segregation, the Court determined that thirty-days was not a "dramatic departure from the basic conditions" of his indeterminate sentence. *Id.* at 485. The Court also noted that the record reflected that the conditions imposed on the plaintiff in disciplinary segregation "mirrored those conditions" that inmates experienced in administrative segregation, protective custody, and the general population. *Id.* at 487. The Court held, therefore, that the plaintiff did

not have a protected liberty interest in remaining free from his thirty-day confinement in disciplinary segregation that would entitle him to procedural due process protections. *Id*. at 487.

Since *Sandin*, the Sixth Circuit has held that "to implicate a cognizable liberty interest in the prison setting, . . . the discipline must be unusual and substantial 'in relation to the ordinary incidents of prison life.'" *Harden-Bey*, 524 F.3d at 792 (quoting *Sandin*, 515 U.S. at 484). A plaintiff, moreover, cannot rely "solely upon the mandatory language of . . . prison regulations concerning placement into administrative segregation to support his claim of a liberty interest." *Rimmer-Bey v. Brown*, 62 F.3d 789, 790 (6th Cir. 1995). Instead, a plaintiff must prove, "[a]part from any mandatory language in a regulation, . . . that he suffered restraint" that imposed an atypical and significant hardship. *Id*. at 790–91.

The duration of an inmate's segregated confinement is essential when considering whether an inmate's confinement imposes atypical and significant hardship on the inmate. *See Harden-Bey*, 524 F.3d at 795 (holding that the district court erred "on the conclusion that the duration of the segregation has little or no bearing on whether that segregation was atypical and significant"). At least two Sixth Circuit opinions, for instance, have established that the duration of an inmate's confinement in segregation itself can implicate a liberty interest. *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012). In *Harris*, the Court held that the inmate's eight-year confinement in administrative segregation was enough to implicate a liberty interest, stating that this duration was "atypical." 465 F. App'x at 484. The Sixth Circuit in *Selby* similarly held that, in light of *Harris*, it had "no difficulty holding that" the inmate's thirteen years of confinement in administrative segregation gave rise to a liberty interest. 734 F.3d at 559.

But when the length of an inmates' segregated confinement, itself, is insufficient to implicate a liberty interest, the Sixth Circuit has also considered additional factors, in their totality, when determining whether an inmate's continued confinement imposes atypical and significant hardship on the inmate: the reasons for an inmate's continued confinement in segregation; the conditions of an inmate's confinement "'in relation to the ordinary incidents of prison life'"; and the impact the confinement will have on the inmate's sentence. *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998) (quoting *Sandin*, 515 U.S. at 472, 483); *see Jones v. Raye*, No. 12-6567, 2014 WL 10319865, at *1–*2 (6th Cir. June 3, 2014) (holding that the inmate's two-and-a-half-year confinement "may have been atypical," but was for "good reason" when he assaulted corrections officers). In *Baker*, for example, the Sixth Circuit held that the plaintiff's confinement in administrative segregation, apart from the general prison population, did not implicate a liberty interest. 155 F.3d at 811–12. The plaintiff was serving a prison sentence of fifteen to twenty-five years. *Id*. at 811. A prison riot that resulted in the deaths of nine inmates and one prison officer led to the plaintiff's confinement in "nondisciplinary segregation, known as Security Control." *Id.* The plaintiff remained in segregation for approximately two-and-a-half years pending the prison's investigation into the riot and until he was cleared of any wrongdoing. *Id*.

Although the Court noted that the length of the plaintiff's two-and-a-half-year confinement "may [have] be[en] atypical," it was justified because his stay was for "extraordinarily good reasons," *i.e.*, plaintiff having been implicated in the murder of a prison officer. *Id*. at 812–13. It also noted that the conditions of plaintiff's confinement in segregation were "not much different" from what other inmates experienced in segregation. *Id*. at 813. Nor was there evidence that the plaintiff's two-and-a-half-year confinement in segregation would

have affected his overall prison sentence. *Id*. at 812–13. The Court, therefore, affirmed the district court's decision granting the defendant's summary judgment motion. *Id*.

*Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997), is another example in which the Sixth Circuit considered the length of and reasons for the inmate's continued confinement in administrative segregation. There, the plaintiff remained in administrative segregation for an additional 117 days despite his eligibility for transfer. *Id*. at 461. According to the defendant, the delay in the plaintiff's transfer was due to a scarcity of beds and overcrowding at the two facilities that were willing to accept the plaintiff for transfer. *Id*. The Court held that the defendant's failure to promptly transfer the plaintiff out of administrative segregation did "not impose an atypical or significant hardship on him" because the delay "was understandable." *Id*. at 463. His continued detention in administrative segregation, therefore, did not implicate a liberty interest. *Id*.

Defendant relies on *Mackey*, comparing the facts there to Plaintiff's case and stating that, like *Mackey*, "'[t]he delay in transferring [Plaintiff] was [also] understandable[.]'" (Doc. 41, at 9 (quoting *Mackey*, 111 F.3d at 463).) As mentioned in the previous section of this opinion, Defendant attests that the reasons for Plaintiff's continued SMU confinement was because a prison had not yet accepted Plaintiff for transfer. (Doc. 42 at 1–2.) He therefore maintains that he had "no control over [Plaintiff]'s transfer," and he could "not make another prison accept [Plaintiff]'s transfer." (*Id*. at 2.)

Defendant also attests that once an inmate completes the SMU program, the inmate is placed on a list for transfer to another prison of the inmate's choice. (*Id*. at 1.) The list is sent weekly to the TDOC Classification Direct and the SMU Coordinator, and an inmate can only be

transferred upon that prison's acceptance of the inmate. (*Id.*) He also explains that Plaintiff's transfer was further delayed since March 2020 due to the Covid-19 pandemic. (*Id.* at 3.)

Defendant's exhibits, which contain two summary reports from the Board, the first dated November 26, 2018, and the second dated January 10, 2019, both reflect that Plaintiff "ha[d] graduated from SMU and [wa]s waiting to be moved." (Doc. 42-3, at 1–2.) Defendant signed the Board's summary reports. (*Id.*) The inmate transfer lists attached to Defendant's motion also show that Plaintiff was an SMU graduate and was waiting to be transferred to WTSP, SPND, or NWCX. (Doc. 42-1, at 1, 3, 6–7, 11, 13.)

Plaintiff responds that there are genuine issues of material fact as to whether his continued confinement "in administrative segregation," after he completed the SMU program, implicated a liberty interest. (Doc. 46, at 1–2.) He points to the length and conditions of his confinement in the SMU as proof that his continued confinement there imposed atypical and significant hardship on him, stating that he was "locked down in a cell 23 hours a day with 1 hour yard time" and that Defendant denied him "contact visit[s], more phone time, and more recreation." (Doc. 47, at 1.) He does not dispute that he was placed on MCCX's inmate transfer list once he completed the SMU program. But he appears to challenge the reasons for this continued confinement, stating in his opposition that his "segregation continued for no reason after" he completed the SMU program. (Doc. 46, at 6.) In his declaration, he also disputes that Defendant had no control over his transfer, stating that Defendant had authority to "[a]dministrative[ly] transfer [him]." (Doc. 48, at 2.) In his "undisputed material facts," he points to Defendant's answer to Plaintiff's interrogatory as proof that Defendant had the authority to transfer him administratively. (Doc. 45, at 1 (citing Pl.'s Interrog.)) According to

Plaintiff, Defendant stated in his answer that he had authority to transfer Plaintiff administratively. *Id*.

Defendant, in reply, argues that Plaintiff has no constitutional right to contact visits, more recreation time, or to unlimited phone calls. (Doc. 49, at 1.) He further argues that "[o]ne hour of recreation time 5 days a week is constitutionally sufficient." (*Id*. at 2.) He maintains that Plaintiff misquotes his answer to Plaintiff's interrogatory. (*Id*.) He clarifies that his complete answer is as follows: "Administrative Transfers are worked out between Wardens. Yes, I have that authority if a Warden at another facility agrees to accept the inmate. I do not have authority to just transfer inmates." (*Id*. at 2–3.)

The Court has drawn "all justifiable inferences" in Plaintiff's favor, as it must do at this stage. *Anderson*, 477 U.S. at 255. Plaintiff, nonetheless, fails to set forth "significant *probative* evidence in support of [hi]s complaint[s]" that could lead a reasonable jury to conclude that Plaintiff's continued confinement in the SMU implicated a liberty interest. *Copeland*, 57 F.3d at 479 (emphasis added). As to the duration of Plaintiff's confinement in the SMU, *Harris*, *Selby*, and *Baker* indicate that his approximate two-year confinement there, itself, is insufficient to implicate a liberty.

Plaintiff's complaints regarding the conditions of his confinement in the SMU, moreover, do not amount to "atypical and significant hardship," even when viewed in their totality. *Sandin*, 515 U.S. at 484. The Sixth Circuit in *Argue* squarely answered whether an inmate's confinement in a cell for twenty-three hours a day imposed an atypical and significant hardship on him. 80 F. App'x at 429; *see Rimmer-Bey*, 62 F.3d at 791 n.3 (noting that the Supreme Court in *Sandin* "concluded that confinement in disciplinary segregation for 23 hours and 10 minutes per day" did not implicate a liberty interest). The Court determined that it did not, stating that the

inmate's confinement in administrative segregation for "twenty-three hours per day . . . d[oes] not rise to the level of constitutional magnitude[.]" *Argue*, 80 F. App'x at 429. The Court also recognized, as Defendant points out in his reply, that it "has never set a minimum amount of time a prisoner must have access to outdoor recreation." (Doc. 49, at 1 (citing *Argue*, 80 F. App'x at 430).)

The law is also well-settled in this circuit that an inmate's temporary loss of privileges and restrictions on privileges do not rise to the level of constitutional magnitude. *See Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir. 2003) (holding that the inmate did not have a "liberty interest in freedom from . . . penalties"); *see also Dixon v. Morrison*, No. 1:13-cv-1078, 2013 WL 6512981, at *7 (W.D. Mich. Dec. 12, 2013) (holding that the inmate's temporary loss of privileges "was not atypical and significant"); *Durham v. Jeffreys*, No. 1:13-cv-226, 2013 WL 6147921, at *3 (S.D. Ohio Nov. 22, 2013) (holding that an inmate's one-hundred-day loss of recreational privileges and telephone-use did not implicate a constitutionally protected liberty interest); *Johnson v. Vroman*, No. 1:06-CV-145, 2006 WL 1050497, at *2 (W.D. Mich. Apr. 19, 2006) (holding that the inmate's six-month restriction on telephone privileges did "not amount to an atypical or significant hardship in relation to the ordinary incidents of prison life"). Here, Plaintiff has not provided any evidence that he suffered a complete or indeterminable loss of privileges—instead, he asserts in his declaration that Defendant denied him "*contact* visit[s], *more* phone time, and *more* recreation" by failing to transfer him out of the SMU. (Doc. 47, at 1 (emphasis added).) Nor has Plaintiff offered any evidence showing how these restrictions may have differed from those experienced by other inmates in segregation at MCCX. *See Sandin*, 515 U.S. at 487 (comparing the conditions of plaintiff's confinement in disciplinary segregation to those conditions experienced by other inmates in segregation); *see also Baker*, 155 F.3d at 813

32

(noting that the plaintiff's conditions in confinement "were not much different" from what other inmates experienced in segregation).

Lastly, the undisputed evidence shows that other SMU graduates, like Plaintiff, were awaiting transfer, and Plaintiff's bald assertion that Defendant did not exercise his authority to "[a]dministrative[ly] transfer [him]" to another prison or the general prison population at MCCX is insufficient to defeat Defendant's motion for summary judgment. (Doc. 48, at 2.) The Supreme Court in *Sandin* stressed that courts should refrain from entangling themselves "in the day-to-day management of prisons" and that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage" their prisons. 515 U.S. at 482. Since *Sandin*, the Sixth Circuit has also held that, when evaluating a prisoner's asserted liberty interest, courts must be mindful that "[t]he curtailment of certain rights is necessary . . . to accommodate a myriad of institutional needs and objectives of prison facilities[.]" *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005) (internal quotation marks and quotation omitted). For the foregoing reasons, Plaintiff has failed to "present significant probative evidence," *Copeland*, 57 F.3d at 479, that could lead a reasonable jury to conclude that his continued confinement in the SMU imposed "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," *Sandin*, 515 U.S. at 484.

### ii. Process Due

The Supreme Court has held that "officials must engage in some sort of periodic review of the [inmate's] confinement." *Hewitt*, 459 U.S. at 477 n. 9. The review, however, does "not necessarily require that prison officials permit the submission of any additional evidence or statements." *Id.* An official's decision to keep an inmate confined in segregation, rather, "must be supported by 'some evidence'"—a requirement that "balances the procedural rights of [the]

33

prisoner against the need of prison officials to have freedom to operate their facilities on a day-to-day basis." *Harris,* 465 F. App'x at 484–85 (quoting *Superintendent v. Hill,* 472 U.S. 445, 454 (1985)). "A prisoner is not entitled to a written statement explaining the reasons for his placement in administrative segregation." *Rodgers v. Johnson,* 56 F. App'x 633, 636–37 (6th Cir. 2002) (citation omitted). But when the "segregation continues for several years, due process requires that the prisoner receive periodic reviews *and* that the continuance of segregation be supported by *some* evidence." *Raye,* 2014 WL 10319865 at *2 (emphasis added) (citing *Selby,* 734 F.3d at 554, 559).

The Sixth Circuit's decision in *Raye* demonstrates when an inmate's continued confinement is supported by "some evidence." *Id.* at *2. The Court first determined that the inmate's two-and-a-half-year confinement in segregation did not implicate a liberty interest because his continued stay there was for "good reason," *i.e.*, assaulting corrections officers. *Id.* But even if the inmate did have a liberty interest, the Court held that the inmate's continued confinement was supported by "some evidence" because he received monthly reviews from the warden who documented the reasons for his continued confinement. *Id.* at *1–*2.

In *Powell v. Washington,* the Sixth Circuit also held that there was "some evidence to support" the inmate's continued confinement in administrative segregation. 720 F. App'x 222, 227 (6th Cir. 2017) (internal quotation marks omitted). The inmate received a misconduct violation for fighting with another inmate. *Id.* at 224. After a hearing, he was placed in administrative segregation due to this violation. *Id.* At the time that the inmate filed suit against various prison officials for violating his due process rights, he was segregated for about six months and received five reviews from the prison's Security Classification Committee ("SCC") during this sixth-month period. *Id.* at 226. The SCC cited the plaintiff's physical confrontation

34

with another inmate as reasons for his continued confinement. (*Id*.) The Court held that the inmate's hearing and periodic reviews afforded him "sufficient procedural protections." *Id*. at 225.

Defendant argues that, even if Plaintiff has a liberty interest, he was provided periodic reviews during his continued confinement in the SMU. (Doc. 41, at 9.) He points to the various mental-health providers' monthly reviews of Plaintiff and reviews from an MCCX unit counselor as proof that Plaintiff received periodic reviews during his continued confinement in the SMU. (*Id*.)

Defendant's evidence shows that the first reviews documenting the reasons for Plaintiff's continued confinement in the SMU, once Plaintiff graduated from the SMU program, were from the Board. (Doc. 42-3, at 1–2.) Both reviews, dated November 26, 2018, and January 10, 2019, indicate that there were no "recent issues" with Plaintiff, that Plaintiff was an SMU graduate "waiting to be moved," and that "monthly reviews" were to continue per policy. (*Id*.) Plaintiff's monthly mental-health screenings continued after the Board's last review, but there are no reviews documenting the reasons for Plaintiff's continued SMU confinement until December of 2019, when a unit counselor began assessing the reasons for Plaintiff's continued confinement in the SMU on "Continued Segregation Monthly Placement" forms. (Doc. 42-3, at 3–11.) The unit counselor's monthly assessments reflect that Plaintiff was an SMU "graduate awaiting placement by Central Transportation to a new facility." (*Id*.) The unit counselor also noted on the March 2020 through August 2020 assessments that there was "no movement due to COVID 19." (*Id*. at 6–11.)

Plaintiff, in opposition, denies having received "periodic monthly reviews," stating in his declaration that he had not received "reviews of (SMU) since October 2018." (Doc. 48, at 4.)

He also challenges the validity of the unit counselor's monthly assessments, stating that they were "void and illegal" because Defendant failed to sign and date the forms. (*Id*.) He does not address Defendant's actual evidence showing that the Board reviewed his SMU status.

Plaintiff has not "identif[ied] facts in the record that create genuine issues of *material* fact." *Celotex*, 477 U.S. at 324–25 (emphasis added). As Defendant points out in his reply, Plaintiff does not cite to legal authority standing for the principle that monthly reviews are constitutionally deficient if they do not bear the warden's signature. (Doc. 49, at 1.) Nor is the Court aware of any case that so holds.

He also fails to present any evidence showing that he did not receive meaningful, periodic reviews or that his continued confinement in the SMU was unsupported by "some evidence." *See Raye*, 2014 WL 10319865 at *2. Defendant's evidence demonstrates that Plaintiff received periodic reviews and assessments during his continued confinement in the SMU, beginning with the Board and then the unit counselor. (Doc. 42-3, at 1–11.) The Board's reviews and unit counselor's assessments reflect that the reasons for Plaintiff's continued placement in the SMU was because he was awaiting transfer. (*Id*.) The unit counselor's reviews from March 2020 through August 2020 also reflect that the Plaintiff's transfer out of the SMU was further delayed "due to COVID 19." (*Id*. at 6–11.) "[A] reasonable jury could only conclude," therefore, that Plaintiff received periodic reviews and that his continued confinement was supported by "some evidence." *Harris*, 465 F. App'x at 485. For the reasons discussed in this section, Defendant is entitled to summary judgment as a matter of law as to Plaintiff's procedural due process claims, and these claims will be **DISMISSED** accordingly.

### 3. Plaintiff's Equal-Protection Claims

In his amended complaint, Plaintiff, who is African American, alleges that Defendant failed to transfer him out of the SMU "like white inmates" and those "inmates similarly situated," who, like Plaintiff, completed the SMU program, in violation of his fourteenth amendment rights under the Equal Protection Clause. (Doc. 16, at 2, 4.) In liberally construing Plaintiff's allegations, the Court allowed these claims to proceed based on a class-of-one equal-protection claim and a race-based equal-protection claim. (*See* Doc. 31.)

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV. A plaintiff can bring an equal-protection claim based on a class-of-one theory, when, as here, a plaintiff alleges that "the state treated [him] differently from others similarly situated and that there is no rational basis for such difference in treatment." *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The plaintiff, therefore, must not only prove that he was treated different from others similarly situated; he must also prove that there was no rational basis for the alleged difference in treatment. *Id.* A plaintiff can prove the latter element in one of two ways: by (1) "'negativ[ing] every conceivable basis which might support' the government action or . . . [(2)] demonstrating that the alleged action was motivated by animus or ill-will." *Id.* at 711 (quoting *Klimik v. Kent Cty. Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. 2004)).

The Equal Protection Clause also protects individuals, including prisoners, from invidious discrimination based on race. *Wolff*, 418 U.S. at 556. That is, "an inmate, like anyone else, retains the right to be free from . . . race discrimination unsupported by a compelling interest." *Brand v. Motley*, 526 F.3d 921, 924 (6th Cir. 2008). A prisoner asserting a race-based equal-protection claim "must prove that a racially discriminatory intent or purpose was a factor

in the decision of the prison officials." *Copeland*, 57 F.3d at 480. Mere disparate impact itself, although relevant, is insufficient to prove discriminatory intent. *Id*.

### a. Class-of-One Equal-Protection Claim

Defendant argues that he is entitled to summary judgment as a matter of law on Plaintiff's class-of-one equal-protection claim. (Doc. 41, at 10–12.) In his affidavit, he claims that he has not treated Plaintiff differently from other inmates who, like Plaintiff, completed the SMU program at MCCX. (Doc. 42, at 2.) He further attests that the inmate transfer lists attached to his motion show that there were other inmates who, like Plaintiff, were SMU graduates awaiting transfer out of the SMU to other prisons. (Doc. 42-1, at 1–14; Doc. 42-2, at 1–2.) According to Defendant, some of the inmates on the list have been awaiting transfer for a longer time than Plaintiff. (Doc. 42, at 2.)

The lists attached to Defendant's motion do in fact contain the names of the inmates who graduated from the SMU program. (Doc. 42-1, at 1–14.) The lists also contain the date that the inmate graduated from the SMU and their prisons of choice. (*Id*.) The lists also show that some SMU graduates were waiting to be transferred out of the SMU for a longer period than Plaintiff—some awaiting transfer as far back as 2017. (*Id*. at 2, 7.)

Plaintiff responds that there are material issues of fact regarding his class-of-one equal-protection claim. He points to one of Defendant's answers to Plaintiff's interrogatories as proof that Defendant treated him differently than other inmates similarly situated. (Doc. 46, at 7 (citing "Plaintiff Interrogatories . . . at ¶ 10").) According to Plaintiff, Defendant's answer reads as follows: "[H]e has intentionally been treated differently from . . . inmates in a similar situation." (*Id*.) Defendant, however, makes no such concession. Defendant's answer, instead, states the following: "No, Plaintiff has completed the SMU program; however[,] Plaintiff is still

Case 3:19-cv-00032-TRM-HBG   Document 64   Filed 04/21/21   Page 38 of 42   PageID #: 476

housed in the High Security area until his transfer[.]"  (Doc. 44, at 4.)  Plaintiff also states in his declaration that "his name is moved around on the transfer list by . . . way of [Defendant]." (Doc. 48, at 2.)

Plaintiff, however, has not set forth sufficient probative evidence that could lead a reasonable jury to conclude that:  (1) Defendant treated him differently from inmates similarly situated at MCCX; and (2) there was no rational basis for Defendant's alleged difference in treatment of Plaintiff.  *See Warren*, 411 F.3d at 710.  He does not address Defendant's evidence that shows other SMU graduates are or have been awaiting transfer out of the SMU, (Doc. 42-1, at 1–14), some longer than him, (*id*. at 2, 7).  Nor has he provided any evidence that Defendant, by moving his name around on the list, was "motivated by animus or ill-will."  *Olech*, 528 U.S. at 564.  Despite drawing all reasonable inferences in Plaintiff's favor, no reasonable jury could conclude that Defendant treated Plaintiff differently from inmates similarly situated.  Defendant is therefore entitled to summary judgment as to Plaintiff's equal-protection claim based on a class-of-one theory, and this claim will be **DISMISSED** accordingly.

### b.  Race-Based Equal-Protection Claim

Defendant argues that he is also entitled summary judgment as a matter of law on Plaintiff's race-based equal-protection claim.  In his affidavit, he states that "Plaintiff's race has played no part in his continued residence in" the SMU.  (Doc. 42, at 2.)  He further attests that none of his interactions or decisions regarding Plaintiff were motivated by an intentional discriminatory animus and that he has no discriminatory animus towards him.  (*Id*.)  Again, he claims he has no control over whether another prison accepts Plaintiff for transfer; Plaintiff remained confined in the SMU, not for discriminatory purposes, but because another prison had not yet accepted Plaintiff for transfer.  (*Id*.)

39

Defendant also points out that the inmate transfer lists contain the names of both white and black SMU graduates who were awaiting transfer to another facility. (*Id.*; Doc. 42-1, at 1–14.) He states that the lists reflect that both white and black inmates who completed the SMU program were transferred out of the SMU. (Doc. 42, at 2.) The lists attached to Defendant's motion identify the inmates by name, inmate number, and race. (Doc. 42-2, at 1–2.) The lists also show when the inmate was transferred and to what facility. (*Id.*)

Plaintiff argues that Defendant "intentionally treated him differently from white inmates." (Doc. 46, at 6.) According to Plaintiff, Defendant transferred white inmates who completed the SMU program to the general prison population at MCCX but says that Defendant denied him the same opportunity. (*Id.*) In his declaration, he states that "white inmates that have completed the (SMU) that are medium custody level are not held in continued segregation like [him]" and that, on September 22 and September 29, 2020, he personally witnessed white inmates being transferred out of the SMU. (Doc. 47, at 1; Doc. 48, at 3–4.) He only addresses the lists attached to Defendant's motion to the extent that he says "his name [wa]s moved around on the transfer list by . . . way of [Defendant]." (Doc. 48, at 1.)

In his reply, Defendant argues that Plaintiff's claims that he personally witnessed white inmates being transferred to other prisons are not "material disputed facts." (Doc. 49, at 3.) In his supplemental affidavit, he explains that MCCX had resumed "moving inmates again" in September of 2020. (Doc. 52-1, at 1.) He states in his affidavit that Plaintiff, a black inmate, was also transferred out of MCCX to TTCC on October 12, 2020. (*Id.*) Therefore, Defendant maintains, Plaintiff's assertion that "white inmates were being transferred from MCCX does not support Plaintiff's claim of unequal treatment, as Plaintiff, a black inmate, ha[d] been transferred also." (Doc. 49, at 3.)

The Court must inquire into the circumstantial evidence when determining whether invidious discriminatory purpose is a motivating factor behind a prison official's decision. *See Copeland*, 57 F.3d at 481. The Sixth Circuit's opinion in *Copeland*—although the facts there are not directly on point with the facts of Plaintiff's case—addresses when a *pro se* prisoner fails to present "significant probative evidence [of] racial discrimination or purpose" to defeat a defendant's motion for summary judgment. *Id*. The plaintiff had filed suit against prison officials, claiming that they violated his equal-protection rights under the Fourteenth Amendment after they refused to return money that an unidentified visitor deposited into his account. *Id*. at 478–79. The plaintiff's position was that the defendants had returned money to white inmates even though they also received money from unidentified donors. *Id*. at 481. The Sixth Circuit held that, "at best," the plaintiff's allegations merely showed that two white inmates circumvented prison policy, rather than a "circumstantially suspicious sequence of events leading up to the [defendants'] decision to remove the money" from the plaintiff's account. *Id*. The Court affirmed the district court's decision granting summary judgment in the defendants' favor. *Id*.

Like the plaintiff in *Copeland*, Plaintiff has not provided "*significant* probative evidence" showing that Defendant's failure to transfer Plaintiff out of the SMU was motivated by discriminatory intent or purpose. *Id*. at 479 (emphasis added). In his declarations, Plaintiff also does not deny, or otherwise address, Defendant's evidence showing that black and white inmates who were SMU graduates were transferred to other prisons. (*See* Doc. 42-2, at 1–2.) Nor does the record contain evidence of a "circumstantially suspicious sequence of events" from which the Court could reasonably infer that discriminatory intent was the motivating factor behind Defendant's failure to transfer Plaintiff out of the SMU. *Copeland*, 57 F.3d at 481. Despite

drawing all reasonable inferences in favor of Plaintiff, no reasonable jury could conclude that Defendant's failure to transfer him out of the SMU was based on discriminatory intent or purpose. Defendant is therefore entitled to summary judgment as a matter of law as to Plaintiff's race-based equal-protection claim, and this claim will be **DISMISSED**.

## IV.      CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 40) is **GRANTED**, and this action will be **DISMISSED WITH PREJUDICE**. Defendant's Motion to Revoke Plaintiff's *in Forma Pauperis* Status (Doc. 54),[13] and Plaintiff's Motion for Subpoenas (Doc. 39) are **DENIED as MOOT**. The Court certifies that any appeal from this decision would not be taken in good faith and that Plaintiff should be **DENIED** leave to proceed *in forma pauperis* on any subsequent appeal.

**AN APPROPRIATE JUDGMENT WILL ENTER**.

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

---

[13]  In his Motion to Revoke Plaintiff's *in Forma Pauperis* Status, Defendant moves the Court to order Plaintiff to pay "the Court filing fee in full . . . or suffer dismissal of this" action. (Doc. 54, at 3.) Because the Court has determined that this action should be dismissed for the reasons detailed in this opinion, Defendant's requested relief in his motion (Doc. 54) is moot.